Larry GASTON, Plaintiff,

v.

THE RESTAURANT COMPANY a/k/a The Restaurant Company of Delaware d/b/a Perkins Restaurant and Bakery, Defendant.

No. C02–3015–MWB.

United States District Court, N.D. Iowa, Central Division.

May 5, 2003.

Michael J Carroll, Coppola, Sandre, McConville & Carroll, PC, West Des Moines, IA, for Plainitff.

Shannon M Magill, Littler & Mendelson, PC, Minneapolis, MN, Richard H Moeller, Berenstein Moore Berenstein Heffernan & Moeller, LLP, Sioux City, IA, Donald W Selzer, Jr., Chad W. Strathman, Minneapolis, MN, Littler & Mendelson, PC, Minneapolis, MN, for Defendant.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDNAT'S MOTION FOR SUMMARY JUDGMENT

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I. *INTRODUCTION* ...................................................... 743
   A.  *Procedural Background* ......................................... 743
   B.  *Factual Background* ........................................... 744

II. *LEGAL ANALYSIS* .................................................. 747
   A.  *Standards For Summary Judgment* ............................ 747
      1.  *The parties' burdens* ..................................... 747
      2.  *Summary judgment in employment discrimination cases* ............. 747
   B.  *Gaston's ADA Claim* ......................................... 749
   C.  *Gaston's Disparate Treatment Claim* ........................... 749
   D.  *Discharge In Violation Of Public Policy Claim* ................... 758
      1.  *Prong one: Protected activity* .............................. 758
      2.  *Prong two: Adverse employment action* ...................... 759
      3.  *Prong three: Causal connection* ............................ 759

III. *CONCLUSION* ..................................................... 762

### I. INTRODUCTION

#### A. Procedural Background

On February 21, 2002, Larry Gaston ("Gaston") filed a complaint against his former employer, defendant The Restaurant Company d/b/a Perkins Restaurant and Bakery ("Perkins"), alleging three causes of action: (1) a claim of disability discrimination; (2) a claim of sexual discrimination; and (3) a claim of retaliatory discharge in violation of Iowa public policy. Gaston contends that all three led to his discharge in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*, the Iowa Civil Rights Act ("ICRA"), chapter 216 of the Iowa Code, and Iowa public policy.

A trial in this matter is presently scheduled for August 4, 2003. Mr. Gaston is represented by Michael Carroll of Coppola, Sandre, McConville & Carroll P.C., West Des Moines, Iowa. Perkins is represented by Donald Selzer, Jr. and Chad W. Strathman of Littler Mendelson, P.C., Minneapolis, Minnesota, and Richard Moeller of Berenstein, Moore, Berenstein,

Heffernan & Moeller, L.L.P., Sioux City, Iowa. Before discussing the standards for Perkins's Motion for Summary Judgment, however, the court will first examine the factual background of this case.

### B. Factual Background

Whether or not a party is entitled to summary judgment ordinarily turns on whether or not there are genuine issues for trial, *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990), and the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Quick*, 90 F.3d at 1377 (same). Thus, a summary of the undisputed and disputed facts is essential to the disposition of Perkins's Motion for Summary Judgment.

Gaston first worked for Perkins in the capacity of general manager of its Clear Lake, Iowa, restaurant beginning in May 1999. Gaston was recruited for the position by the then Regional Manager, David Ahlberg ("Ahlberg"), to cure the present financial and performance issues the restaurant suffered. Perkins asserts that the Clear Lake restaurant continued to have financial issues under Gaston's management. On September 29, 1999, Ahlberg sent a letter to Gaston stating that the "restaurant is under performing from a financial standpoint." Def.'s Ex. 8, at 0006. Ahlberg noted in the letter that the restaurant in August, year-to-date (YTD), was under the sales plan by $43,000 and under the profit plan by $26,800, respectively. Def.'s Ex. 8, at 0006. Gaston denies Perkins's assertion and contends that he was able to achieve, "[f]or the most part," the profit plan during the time he managed the Clear Lake Restaurant. Pl.'s Dep., at 000008. Gaston admits that the restaurant's labor costs one month exceeded that specified by the plan and attributed this increase to the restaurant's sales being softer than anticipated. Gaston also cites softer than anticipated sales as interfering with his ability to achieve the sales and profit plans in May and August YTD, as indicated in Ahlberg's letter. Pl.'s Dep., at 000008. However, Gaston interpreted Ahlberg's letter as merely "constructive criticism," and did not believe that the letter was a factor in his leaving the company approximately three months later. Pl.'s Aff., at 000146. In fact, Gaston asserts that during the three months after he received the letter, the Clear Lake restaurant's performance did not falter but improved. Pl.'s Dep., at 000009. Perkins states that Gaston voluntarily quit as general manager of the Clear Lake Perkins for a lower-paying job with Super 8 Motel. Gaston admits that he initially suffered a reduction in salary when he accepted the position with Super 8 Motel, but took the position nevertheless because it was still in the hospitality business "but without all the issues that went with [working with food]." Pl.'s Dep., at 000009.

Gaston returned to work for Perkins on a part-time basis at the Mason City restaurant in July 2000, after Ahlberg and Kevin Miller ("Miller"), then general manager of Perkins's Waterloo restaurant, approached Gaston about the job. Thereafter, Gaston began functioning as the general manager of the Mason City restaurant. Gaston does not claim that he was treated unfairly while working for Ahlberg. According to Gaston, it was when Ahlberg was replaced as Regional Manager by Chris Bosch ("Bosch") that things changed for the worse. For starters, on September 7, 2000, Bosch gave Gaston a final written warning. The letter began by addressing Gaston's practices regarding human resource issues. Perkins argues, as documented by Bosch in the written warning,

that Bosch discovered "since July 2000, [that] Gaston quickly had developed a negative pattern in the area of employee relations at the Mason City store." Bosch's Aff., at 2. As evidence of this negative pattern, Perkins and Bosch cite Gaston's receipt of three AlertLines and a Guest Line within five days of each other. Perkins's AlertLine program is a 1–800 number available to all Perkins's employees, anonymously, in order to complain about working conditions and other employee complaints. Perkins alleges that two of the AlertLines were in regard to Gaston's ability to handle crisis management. The first complaint was from a terminated employee who complained she was treated unfairly. Gaston denies the allegation because he claims to have legitimately terminated her due to inappropriate conduct—swearing in the restaurant in front of customers. The second complaint came from a guest who allegedly witnessed Gaston terminating an employee. Gaston denies that a second termination occurred, and adds that he never dealt with employee relations issues in front of customers. Pl.'s Dep., at 76–77. The third complaint was received from an applicant who wanted to interview with the Perkins's Mason City restaurant. Gaston claims that he was not aware of the situations giving rise to the second and third AlertLine calls. Pl.'s Dep., at 78.

Also in the final written warning, Bosch states that some of the new employees were allowed to work despite the fact that their personnel files lacked the proper documentation in violation of company policy. Gaston disputes this accusation and contends that the new employee personnel files complied with company policy. Gaston admitted that the personnel files of those employees already employed at the Mason City Perkins before he became general manager, were not complete and he and Miller posted a notice in the store alerting those employees affected. Finally, the written warning issued by Bosch detailed the financial results of the Mason City restaurant through August, informing Gaston that "These levels are not acceptable." Def.'s Ex. 12, at 0023. In addition, Bosch attached the letter that Ahlberg sent to Gaston while Gaston was the manager of the Clear Lake Perkins. In his warning, Bosch commented that "The letter addresses your lack of ability to gain financial control of [sic] restaurant unit # 1065. This letter is clearly touching upon CPH and DOE issues. This is very disturbing and causes concern to me." Def.'s Ex. 12, at 0023. Similarly, when Bosch presented the warning to Gaston he told Gaston that "I don't think you're up to the task. I really don't think that you can do this job for us. I'm going to give you a week's paycheck if you just get up and walk away from the restaurant." Pl.'s Dep., at 70.

Gaston responded to the final written warning and verbal comments by Bosch by telling Bosch that he "did not think it was fair. . . . I [Gaston] did not think I was given ample time to address all the issues and take care of the needs that needed to be taken care of to bring the Mason City store back on the track to recovery." Pl.'s Dep., at 70. Gaston declined Bosch's offer to leave Perkins's employment, and told Bosch that he would get the store back on track. Gaston admits that at the September 7, 2000, meeting with Bosch and Miller, he did not believe Bosch issued him the final written warning for any other reason than those stated in the warning.

Perkins's asserts that after learning of Gaston's personnel problems and the poor financial status of the Mason City restaurant, Bosch decided to assign Kevin Miller to the restaurant to assist Gaston a few days each week. Gaston disputes Perkins's assertion and claims that Miller assisted with the Mason City restaurant both

prior to and until Gaston was brought on as general manager on a full-time basis. According to Gaston, Miller would assist Gaston with ordering food stuffs, inventory and purchases. Gaston claims that Miller's assistance prior to Bosch's alleged assignment of Miller to the restaurant is evidenced by a July 16, 2000, email Miller wrote to Ahlberg identifying the weaknesses and problematic areas within the Mason City Perkins.

A little less than two weeks after the September 7, 2000, meeting in which Bosch issued Gaston his final written warning, Perkins took steps to reorganize certain positions within the region that included the Mason City restaurant. The reorganization included the elimination of the position of Regional Food Production Manager, then occupied by Chris Fogel ("Fogel"). Perkins gave Fogel the option of becoming a general manager, which he accepted, and became the general manager of the Cedar Rapids's Perkins. Melissa Kies ("Kies"), then general manager of the Cedar Rapids's Perkins, became the general manager of the Mason City Perkins because Bosch "believed that Kies was a successful General Manager that could handle the Mason City store and its ongoing issues." Bosch's Aff., at 3. After Kies accepted the general manager position at the Mason City restaurant, Bosch offered Gaston the position of Food Production Manager ("FPM") at the Mason City restaurant at the same rate of pay. Gaston argues, and Perkins does not dispute, that the position of Food Production Manager was a demotion despite Gaston's receipt of the same rate of pay as that of the general manager. However, when asked whether Gaston regarded the demotion as unfair, Gaston stated "I don't know if I felt anything one way or another.... Well, I guess I cared, but as I said, I'm very good in the kitchen and very good at that as well." Pl.'s Dep., at 99. In addition, Gaston admits that he did not initially even perceive

the FPM position to be a demotion "because of the fact that I received the same rate of pay, of course....And he (Bosch) had said due to the fact that I needed more training, so I did not feel it as being a demotion." Pl.'s Dep., at 97.

Thereafter, Gaston functioned as the FPM and Kies as the general manager of the Mason City Restaurant. According to Gaston, he thought he and Kies worked well together and believed that Kies treated him fairly. Pl.'s Dep., at 100 & 108. Gaston claims that their only disagreement concerned the snow removal contracts for the restaurant. Gaston contends in his affidavit that Kies never asked him specifically whether he had entered into and signed a snow removal contract, or if such a contract existed in the first place. However, Gaston concedes that "Melissa and I talked about many things when she first came to the store, of course, and I'm sure that that's probably one of the things that did come up." Pl.'s Dep., at 102.

On October 16, 2000, Gaston slipped and fell at work. Consequently, Gaston was diagnosed with a small puncture on his left lung, fractured ribs, and a possible rotator cuff tear. Gaston's injury did not require him to miss any scheduled time at work or to reduce his work hours. However, Gaston was temporarily required to wear a sling on his right arm, refrain from lifting, and to keep his right arm at his side. On October 18, 2000, Gaston filed a workers' compensation claim with the Iowa Industrial Commissioner, which he settled with Perkins on May 1, 2002. Pl.'s App., at 000100; Def.'s App., at C. After his injury, Gaston was able to work with accommodation and continued to do so up until his employment was terminated on November 17, 2000. On November 16, 2000, two people showed up at the Mason City Perkins to remove the snow from the parking lot. Perkins's alleges that it terminated

Gaston the following day because he violated company policy when he entered into a snow removal contract for the restaurant with Kevin Sutcliffe ("Sutcliffe") without first gaining the approval of Regional Manager Chris Bosch, and because when General Manager Melissa Kies discovered Gaston's contract with Sutcliffe, Gaston informed Kies that it was not binding.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo,* 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part,* 202 F.3d 1035 (8th Cir.), *cert. denied,* 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000). The trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but rather is to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir. 1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of sum-

mary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *accord Rouse v. Benson,* 193 F.3d 936, 939 (8th Cir. 1999).

### 1. The parties' burdens

Procedurally, the moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the portions of the record showing a "lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Rose–Maston v. NME Hospitals, Inc.,* 133 F.3d 1104, 1107 (8th Cir.1998). The opposing party is required to go beyond the pleadings and, by either affidavits or the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.,* 122 F.3d 559, 562 (8th Cir.1997). If the opposing party fails to make a sufficient showing of an essential element of a claim for which that party has the burden of proof, then the movant is "entitled to judgment as a matter of law." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d 1484, 1492 (8th Cir.1997). In considering a motion for summary judgment, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348; *Quick,* 90 F.3d at 1377.

### 2. Summary judgment in employment discrimination cases

Because this is an employment discrimination case, it is well to remember that the Eighth Circuit Court of Appeals has cau-

tioned that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir.1991)); *see also Chock v. Northwest Airlines, Inc.,* 113 F.3d 861, 862 (8th Cir.1997) ("We must also keep in mind, as our court has previously cautioned, that summary judgment should be used sparingly in employment discrimination cases," citing *Crawford* ); *Smith v. St. Louis Univ.,* 109 F.3d 1261, 1264 (8th Cir. 1997) (quoting *Crawford* ). Summary judgment is appropriate in employment discrimination cases only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." *Johnson,* 931 F.2d at 1244; *see also Webb v. St. Louis Post–Dispatch,* 51 F.3d 147, 148 (8th Cir.1995) (quoting *Johnson,* 931 F.2d at 1244). To put it another way, "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Crawford,* 37 F.3d at 1341; *accord Snow,* 128 F.3d at 1205 ("Because discrimination cases often turn on inferences rather than on direct evidence, we are particularly deferential to the nonmovant.") (citing *Crawford,* 37 F.3d at 1341); *Webb v. Garelick Mfg. Co.,* 94 F.3d 484, 486 (8th Cir.1996) (citing *Crawford,* 37 F.3d at 1341).

Nevertheless, the Eighth Circuit Court of Appeals also observed that "[a]lthough summary judgment should be used sparingly in the context of employment discrimination cases, the plaintiff's evidence must go beyond the establishment of a prima facie case to support a reasonable inference regarding the alleged illicit reason for the defendant's action." *Landon v. Northwest Airlines, Inc.,* 72 F.3d 620, 624 (8th Cir.1995) (citing *Reich v. Hoy Shoe Co.,* 32 F.3d 361, 365 (8th Cir.1994)); *accord Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1134 (8th Cir.1999) (*en banc* ) (observing that the burden-shifting framework of *McDonnell Douglas* must be used to determine whether summary judgment is appropriate), *cert. denied,* 528 U.S. 818, 120 S.Ct. 59, 145 L.Ed.2d 51 (1999). More recently, in *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court reiterated that " '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097 (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).3 [1] Thus, what the plaintiff's evidence must show, to avoid summary judgment or judgment as a matter of law, is " '1, that the stated reasons were not the real reasons for [the plaintiff's] discharge; and 2, that age [or race, or sex, or other prohibited] discrimination was the real reason for [the plaintiff's] discharge." *Id.* at 153, 120 S.Ct. 2097 (quoting the district court's jury instructions as properly stating the law). The Supreme Court clarified in *Reeves* that, to meet this burden, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148, 120 S.Ct. 2097.

---

**1.** In *Reeves,* the Supreme Court was considering a motion for judgment as a matter of law after a jury trial, but the Supreme Court also reiterated that "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.' " *Reeves,* 530 U.S. at 150, 120 S.Ct. 2097 (quoting *Liberty Lobby, Inc.,* 477 U.S. at 250–51, 106 S.Ct. 2505). Therefore, the standards articulated in *Reeves* are applicable to the present motion for summary judgment.

The court will apply these standards to Perkins's Motion for Summary Judgment, addressing each of the disputed issues in turn.

### B. Gaston's ADA Claim

As an initial matter, the court addresses Perkins's contention regarding Gaston's disability discrimination claim under the ADA. Perkins argues that Gaston cannot establish his *prima facie* case of disability discrimination because he admits that the physical restrictions were temporary and did not result in any ongoing limitations. However, Gaston concedes in his Resistance to Perkins's Motion for Summary Judgment that there are no genuine issues of material fact with regard to his disability discrimination claim under the ADA and therefore, the court will grant that part of Perkins's Motion for Summary Judgment.

### C. Gaston's Disparate Treatment Claim

Gaston contends that Perkins discriminated against him because of his sex in violation of 42 U.S.C. § 2000e *et seq* and Chapter 216 of the Iowa Code.3 [2] The United States Supreme Court recognizes two theories to prove employment discrimination under Title VII of the Civil Rights Act of 1991. *See International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). One is the disparate treatment theory, and the other is the disparate impact theory. *Id.* Here, Gaston alleges disparate treatment by Perkins. The United States Supreme Court defined disparate treatment in *International Bhd. of Teamsters:*

> Disparate treatment ... is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment....

*Id.* at 335 n. 15, 97 S.Ct. 1843.

There are two methods by which a plaintiff can attempt to prove intentional employment discrimination. First, the plaintiff can rely upon the standard set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), if the plaintiff produces direct evidence that an illegitimate criterion, such as gender, "played a motivating part in [the] employment decision." *Id.* at 258, 109 S.Ct. 1775. Once the plaintiff establishes such direct evidence, the burden shifts to the employer to demonstrate by a preponderance of the evidence that the employer would have reached the same employment decision absent any discrimination. *Id.* (as modified by section 107 of the Civil Rights Act of 1991, 42 U.S.C. § 2000e-5(g)(2)(B)(i)–(ii)).3 [3] If the employer fails to

---

**2.** Both the state and federal sex discrimination claims are analyzed according to the *McDonnell Douglas* burden-shifting paradigm. *See O'Sullivan v. Minnesota*, 191 F.3d 965, 969 (8th Cir.1999) ("These claims [of gender discrimination] are governed by the familiar analytical framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668, (1973)."); *Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999) ("The ICRA was modeled after Title VII of the United States Civil Rights Act. Iowa courts therefore traditionally turn to federal law for guidance in evaluating the ICRA." *King v. Iowa Civil Rights Comm'n*,

334 N.W.2d 598, 601 (Iowa 1983)); *Board of Supervisors v. Iowa Civil Rights Comm'n*, 584 N.W.2d 252, 256 (Iowa 1998) ("In deciding gender discrimination disputes, we adhere to the Title VII analytical framework established in *McDonnell Douglas Corp. v. Green*) (citations omitted).

**3.** The pertinent statutory language follows:

On a claim in which an individual proves a violation under section 2000e–2(m) of this title and a respondent demonstrates that the respondent would have taken the same

meet this standard, the employee prevails. Alternatively, the plaintiff can proceed under the three-stage, burden-shifting standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Texas Dep't of Com. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. Once a *prima facie* case is established, a rebuttable presumption shifts the burden to the employer to articulate a legitimate, nondiscriminatory reason for discharging the employee. If the employer articulates such a reason, the presumption disappears and the plaintiff bears the burden of proving that the employer's proffered reason is merely a pretext for discrimination. Here, plaintiff Gaston does not assert that he has direct evidence that gender was a motivating factor in Perkins's differential treatment of him. Therefore, the court turns to the three-stage, burden-shifting standard set forth in *McDonnell Douglas*, 411 U.S. at 792, 93 S.Ct. 1817.

Under the *McDonnell Douglas* analysis, the plaintiff's usual burden to establish a *prima facie* case of employment discrimination is to show that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the job he or she was performing; (3) the plaintiff suffered adverse employment action, or was discharged, under circumstances giving rise to an inference of discrimination; and (4) a nonmember of the protected class (person of the opposite gender in Title VII cases) replaced the plaintiff or was not subjected

to the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir. 1999); *Hanenburg v. Principal Mut. Life Ins. Co.*, 118 F.3d 570, 574–75 (8th Cir. 1997).

The United States Supreme Court clarified the burden-shifting analysis required for discrimination claims in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). In *Reeves*, the court explained the burden-shifting analysis as follows:

> McDonnell Douglas and subsequent decisions have "established an allocation of the burden of production and an order for the presentation of proof in ... discriminatory-treatment cases." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). First, the plaintiff must establish a prima facie case of discrimination. *Ibid.; Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).... [Once the prima facie case is established,] [t]he burden ... shift[s] to [the defendant] to "produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Burdine, supra*, at 254, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207. This burden is one of production, not persuasion; it "can involve no credibility assessment." *St. Mary's Honor Center, supra*, at 509, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407. [A defendant meets] this

---

action in the absence of the impermissible motivating factor, the court—
   (i) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e–2(m) of this title; and

   (ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A).

42 U.S.C. § 2000e–5(g)(2)(B)(i)–(ii).

burden by offering admissible evidence sufficient for the trier of fact to conclude that petitioner was fired [for a legitimate reason]. Accordingly, "the McDonnell Douglas framework—with its presumptions and burdens"—disappear[s], *St. Mary's Honor Center*, supra, at 510, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407, and the sole remaining issue [i]s "discrimination vel non," [*U.S. Postal Service Bd. of Governors v.] Aikens*, 460 U.S. [711,] 714, 103 S.Ct. 1478, 75 L.Ed.2d 403. Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S., at 253, 101 S.Ct. 1089, 67 L.Ed.2d 207. And in attempting to satisfy this burden, the plaintiff—once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision—must be afforded the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Ibid.; see also St. Mary's Honor Center*, supra, at 507–508, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407. That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination "by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, supra, at 256, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207. Moreover, although the presumption of discrimination "drops out of the picture" once the defendant meets its burden of production, *St. Mary's Honor Center*, supra, at 511, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case "and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual," *Burdine*, supra, at 255, n. 10, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207.

*Reeves*, 530 U.S. at 141, 120 S.Ct. 2097.

The court will begin its analysis by examining the first *McDonnell Douglas* requirement—that the plaintiff belong to a protected class—despite both parties' failure to address it in their briefs. Because Gaston is a male and thereby possesses a gender, he is considered a member of a protected class. *See McDonald v. Santa Fe Trail Trans., Co.*, 427 U.S. 273, 280, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) (deciding Title VII prohibits racial discrimination against Caucasian applicants as well as minority applicants, and citing the uncontradicted legislative history of Title VII which was intended to " 'cover white men and white women and all Americans,' " 110 Cong. Rec. 2578 (1964) (remarks of Rep. Cellar)). Where the plaintiff is a male alleging gender discrimination, as in the present case, the claim is characterized as one of reverse discrimination. *Id.* Although the claim remains within the analytic framework established in *McDonnell Douglas*, the Eighth Circuit Court of Appeals discussed in *Duffy v. Wolle*, 123 F.3d 1026, 1028 (8th Cir.1997), *cert. denied*, 523 U.S. 1137, 118 S.Ct. 1839, 140 L.Ed.2d 1090 (1998), how courts should modify the first *McDonnell Douglas* requirement when analyzing a reverse discrimination claim. The Eighth Circuit Court of Appeals recognized in *Duffy* that:

In reverse discrimination cases, several courts have held that, to present a prima facie case, a plaintiff must show "that background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir.1985) (quotations and cita-

tions omitted); *see also Bishopp v. District of Columbia,* 788 F.2d 781, 786 (D.C.Cir.1986) ("A plaintiff's minority status by itself is sufficient in light of historical practice in the workplace toward such socially disfavored groups to give rise to an inference of discriminatory motivation. White males, who as a group historically have not been hindered in the workplace because of their race or sex, are required to offer other particularized evidence, apart from their race and sex, that suggests some reason why an employer might discriminate against them." (quotations, citations, and alterations omitted)).

*Id.* at 1036. The court in *Duffy* proceeded to find that the plaintiff in a reverse discrimination case has the burden to show background circumstances which support the plaintiff's allegations that the defendant was that unusual employer who discriminates against the majority. *Id.; see Gagnon v. Sprint Corp.,* 284 F.3d 839, 848 (8th Cir.2002) (quoting *Duffy,* 123 F.3d at 1036) (requiring plaintiff asserting a claim of reverse race discrimination to show background circumstances identifying the defendant as "that unusual employer who discriminates against the majority").

This court recognizes, as did the Ninth Circuit Court of Appeals recently in an unpublished opinion, that there is a circuit split concerning the additional requirement that plaintiffs in reverse discrimination cases show the existence of background circumstances. *Zottola v. City of Oakland,* 32 Fed.Appx. 307 (9th Cir.2002).3 4 Despite such a split, the court is bound by the Eighth Circuit Court of Appeals's conclusion that a plaintiff asserting a reverse discrimination claim must offer evidence of background circumstances tending to show that the defendant employer discriminates against the majority. *Duffy v. Wolle,* 123 F.3d 1026, 1036 (8th Cir.1997), *cert. denied,* 523 U.S. 1137, 118 S.Ct. 1839, 140 L.Ed.2d 1090 (1998) (citations omitted). In *Gagnon v. Sprint Corp.,* 284 F.3d at 848, the Eighth Circuit Court of Appeals explained that a plaintiff may proceed beyond the *prima facie* case stage of litigation with a reverse discrimination claim, regardless of the failure to show back-

---

**4.** The Ninth Circuit Court of Appeals in *Zottola* compared:

*Duffy v. Wolle,* 123 F.3d 1026, 1036 (8th Cir.1997) [parenthetical omitted]; *Murray v. Thistledown Racing Club, Inc.,* 770 F.2d 63, 67 (6th Cir.1985) (same); *Mills v. Health Care Serv. Corp.,* 171 F.3d 450, 457 (7th Cir.1999) (same); *Notari v. Denver Water Dep't,* 971 F.2d 585, 589 (10th Cir.1992) (same); *Russell v. Principi,* 257 F.3d 815, 818 (D.C.Cir.2001) (same) *with Byers v. Dallas Morning News, Inc.,* 209 F.3d 419, 426 (5th Cir.2000) (holding that a plaintiff in a reverse discrimination case need show only that he is a member of "a protected group" and whites are a protected group under Title VII); *Bass v. Board of County Commissioners,* 256 F.3d 1095, 1103–04 (11th Cir.2001) (same). The Sixth Circuit recently expressed doubt about whether it will continue to use the "background circumstances" test. *See Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 801 n. 7

(6th Cir.1994). The Second and Fourth Circuits also appear to have adopted the Fifth Circuit's approach although they have declined to explicitly address the issue. *See Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 312 (2d Cir.1997) (holding that a white male made out a prima facie case on the basis of national origin and not discussing the need for him to show any "background circumstances"); *Lucas v. Dole,* 835 F.2d 532, 533–34 (4th Cir.1987) (declining to address the issue but holding that a white female satisfied McDonnell Douglas because she is a member of a protected group: whites). The Third Circuit rejects both approaches and instead requires a reverse discrimination plaintiff to "present sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII." *Iadimarco v. Runyon,* 190 F.3d 151, 161 (3d Cir.1999).

ground circumstances, if there is direct evidence of intentional discrimination against the plaintiff. Even so, because Gaston does not assert that he has direct evidence that gender was a motivating factor in Perkins's differential treatment of him, the court concludes that Gaston must show background circumstances that support his allegations that Perkins is that unusual employer who discriminates against men. *Id.* at 848.

While the Seventh Circuit Court of Appeals has recognized that the contours of a "background circumstance" are imprecise, it suggested that a plaintiff could satisfy this prong by showing (1) "some reason or inclination to discriminate invidiously against whites or men, and evidence indicating that there is something 'fishy' about the facts of the case at hand;" or (2) "the person ultimately hired was clearly less qualified than the plaintiff, the hiring authority expressed intense interest in hiring a woman [or minorities], [or] there was a pattern of hiring women [or minorities] in the past;" or (3) that "[he] was the only white employee in the department and all of the decision makers were [African American]." *Mills,* 171 F.3d at 455–57 (internal quotations omitted). The District of Columbia Circuit Court of Appeals has observed that the evidence it has found to constitute sufficient "background circumstances" can be grouped into two categories: "(1) evidence indicating that the particular employer at issue has some reason or inclination to discriminate invidiously against whites ... and (2) evidence indicating that there is something 'fishy' about the facts of the case at hand that raises an inference of discrimination." *Harding v. Gray,* 9 F.3d 150, 153 (D.C.Cir.1993). In *Duffy,* the Eighth Circuit Court of Appeals concluded that the plaintiff had met his burden of showing "background circumstances" by showing: "(1) that [the candidate hired] was substantially less qualified than [the plaintiff]; (2) Chief Judge Wolle

had mentioned an interest by someone in the Administrative Office in the recruitment of a female; and (3) that two members of the Panel had usually hired female law clerks." *See Duffy,* 123 F.3d at 1037. Here, one of the *prima facie* factors at issue is whether Gaston has established that he was demoted and eventually terminated under circumstances which give rise to an inference of discrimination. Perkins's foremost assertion why Gaston is unable to meet this requirement is because Gaston does not identify anything that either Kies or Bosch did or said that suggested to Gaston that his demotion and termination were based on his gender. In addition, Perkins contends that Gaston was not legally entitled to an opportunity to try and restore the Mason City restaurant to a profitable establishment. Instead, Perkins argues that its decisions to demote Gaston to FPM and place Kies in the general management position, and subsequently terminate Gaston's employment, were all proper exercises of its business judgment. Gaston persists that his short tenure as general manager of the Mason City restaurant, coupled with Perkins's attempts to blame him for the restaurant's poor performance and Perkins's offer of a severance package to walk out the door were suspicious. Ultimately, Gaston argues that Perkins attempted to "cover-up favoring the female employee over the male [Gaston] by making the latter's performance appear unsatisfactory." Pl.'s Br., at 10.

■ Gaston admits that at the September 7, 2000, meeting with Bosch and Miller, that he did not believe Bosch issued him the final written warning for any other reason than those stated in the warning. In fact, Gaston does not dispute that Perkins received three AlertLines and a Guest Line call within five days of each other during his tenure as general manager.

Gaston claims that he was not aware of the situations giving rise to the second and third AlertLine calls, and simply disputes the allegations regarding the first Alertline call from a terminated employee who complained she was treated unfairly by Gaston. Also in the final written warning, Bosch states that some of the new employees were allowed to work despite the fact that their personnel files lacked the proper documentation in violation of company policy. Gaston admitted that at least 75 percent of the employee files in the restaurant were incomplete when he took over as general manager, and at the time Bosch issued him the final written warning, Gaston had not finished completing all of the employee files. Finally, the written warning described the financial position of the Mason City restaurant as unacceptable. Gaston did not disagree that the restaurant's cost per hour (CPH) for the months of July and August were .50 below the stated plan, and that direct operating expenses (DOE) for July and August were 6.7 and 4.1 percent—greater than the 3.1 percent that the plan allocated for direct operating expenses. Moreover, it was at this same meeting that Bosch told Gaston that he did not think that Gaston could continue to do the job of general manager because "I don't think you're up to the task," and offered Gaston a one week severance package in exchange for his resignation. Pl.'s Dep., at 70.

Gaston attempts to qualify his testimony—that he believed Bosch's stated reasons for issuing him the final written warning—by claiming that he did not know at the time of the meeting that Kies was a candidate for the position of general manager of the Mason City Perkins. However, Gaston has not come forward with any evidence that Kies was a candidate at the time. In fact, Gaston concedes that Perkins's decision to reorganize certain positions within the Mason City region occurred in the latter part of September 2000, after he received the offer of the severance package. Gaston originally testified that after the September 7, 2000 meeting, Miller told Gaston that Bosch said to Miller, after the meeting, "What are we going to do about Larry [Gaston]?—because now we have Melissa, who is being displaced, and I want to move her to the Mason City store." Pl.'s Dep., at 90. Gaston later clarified his deposition testimony to state that Miller only told Gaston that Bosch said, "What are we going to do about Larry?," to which Miller replied, "What you should be saying is 'What are we going to do for him.'" Pl.'s Dep., at 92. Gaston admits that he did not learn that Kies was to become the general manager at the Mason City Perkins until one week later when he received a phone call from Bosch explaining that Gaston would be moving to the kitchen as FPM "due to the fact that he [Bosch] felt that I needed more training." Pl.'s Dep., at 96. When asked whether Gaston regarded the demotion as unfair, Gaston stated "I don't know if I felt anything one way or another . . . . Well, I guess I cared, but as I said, I'm very good in the kitchen and very good at that as well." Pl.'s Dep., at 99. Moreover, Gaston admits that he did not initially even perceive the FPM position to be a demotion "because of the fact that I received the same rate of pay, of course . . . . And he (Bosch) had said due to the fact that I needed more training, so I did not feel it as being a demotion." Pl.'s Dep., at 97.

In addition, Gaston does not dispute that in late September 2000, Perkins reorganized certain positions within the Mason City region. The reorganization caused the elimination of the position of Guest Service Trainer at the Mason City restaurant, occupied by Claudia Folkerts, a female. According to Gaston, Claudia was placed in another Perkins restaurant. Likewise, the position of Regional Food

Production Manager, occupied by Chris Fogel, a male, was eliminated. Gaston does not dispute that Fogel was given the option of moving to a general manager position and chose to become the general manager of the Cedar Rapids, Iowa, store. Furthermore, Gaston admits that by choosing to become the general manager of the Cedar Rapids' Perkins, Fogel bumped the then existing General Manager, Kies, out of the position. 3 [5]

The court further finds that Gaston has not met the additional requirement in a reverse discrimination case to demonstrate "that background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority," *Duffy*, 123 F.3d at 1036. Here, Gaston has not directed the court's attention to any background circumstances which would support the suspicion that Perkins "is that unusual employer who discriminates against the majority." *Id.*

Moreover, the court finds that even if Gaston were able to establish these threshold elements of his *prima facie* case, he is unable to overcome Perkins's stated legitimate non-discriminatory reason for terminating his employment. The court arrived at this determination by first considering the impact of the apparent disparity between Gaston's explanations in his affidavit regarding the real reason he alleged he was terminated and his explanations given at his deposition at an earlier date. This court recently discussed the applicable

standards to a challenge of such an affidavit in *Barnes v. Northwest Iowa Health Ctr.*, 238 F.Supp.2d 1053, 1093–95 (N.D.Iowa 2002) (quoting *Helm Financial Corp. v. Iowa Northern Railway Co.*, 214 F.Supp.2d 934, 954 (N.D.Iowa 2002)). With respect to Gaston's alleged contradictory testimony, the standards to a challenge include:

As to contradiction of prior testimony, the Eighth Circuit Court of Appeals recently reiterated the following principles: It is well-settled that "[p]arties to a motion for summary judgment cannot create sham issues of fact in an effort to defeat summary judgment." *American Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.*, 114 F.3d 108, 111 (8th Cir. 1997). Consequently, a party should not be allowed to create issues of credibility by contradicting his own earlier testimony. Ambiguities and even conflicts in a deponent's testimony are generally matters for the jury to sort out, but a district court may grant summary judgment where a party's sudden and unexplained revision of testimony creates an issue of fact where none existed before. Otherwise, any party could head off a summary judgment motion by supplanting previous depositions ad hoc with a new affidavit, and no case would ever be appropriate for summary judgment. *Wilson v. Westinghouse Elec. Corp.*, 838 F.2d 286, 289 (8th Cir.1988) (internal citations and quotation marks omitted). *Bass v. City of Sioux Falls*, 232 F.3d 615, 619 (8th Cir.1999); *accord Dotson v.*

**5.** The plaintiff offers inconsistent explanations regarding the origin of Kies's position as general manager of the Cedar Rapids' Perkins. Gaston admits in his Response to Defendant's Statement of Undisputed Material Facts, at ¶ 59, that Fogel chose to become the general manager of the Cedar Rapids' Perkins, displacing Kies who was the general manager. In Gaston's Brief in Support of His Resistance to Defendant's Motion for Summary Judgement, at 9–10, Gaston cites Miller's de-

position testimony which states that Kies was filling in for Fogel while he was on sick leave. However, Gaston does not appear to argue that Kies was merely filling in for Fogel, and thus was not as qualified as Gaston and not entitled to the general manager position at the Mason City Perkins. Additionally, neither party argues that Kies and Gaston were not similarly situated in all relevant respects for purposes of establishing Gaston's *prima facie* case.

*Delta Consolidated Indus., Inc.*, 251 F.3d 780, 781 (8th Cir.2001) ("We have held many times that a party may not create a question of material fact, and thus forestall summary judgment, by submitting an affidavit contradicting his own sworn statements in a deposition. *See, e.g., American Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.*, 114 F.3d 108, 111 (8th Cir.1997), and *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1364–65 (8th Cir.1983)."); *Plymouth Foam Prods., Inc. v. City of Becker*, 120 F.3d 153, 155 n. 3 (8th Cir. 1997) (to the extent that the affiant's affidavit conflicts with his earlier deposition testimony, his affidavit testimony should be disregarded); *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir.1995) (same). The Eighth Circuit Court of Appeals has explained that the rule that a party cannot create a "sham" issue of fact in an effort to defeat summary judgment by filing an affidavit directly contradicting prior deposition testimony "is a sound one," because "if testimony under oath could be 'abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary judgment.'" *Herring v. Canada Life Assur. Co.*, 207 F.3d 1026, 1030 (8th Cir. 2000) (quoting *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1366 (8th Cir.1983)).

However, the Eighth Circuit Court of Appeals has also explained that, where the affidavit testimony seems consistent with the affiant's prior deposition testimony, or simply adds more detailed information, the court may properly consider the affidavit on summary judgment. *Bass*, 232 F.3d at 619. Similarly, the court has recognized "that there are 'narrow circumstances' in which a subsequent affidavit is appropriate, such as to explain certain aspects of the deposition testimony or where the prior testimony reflects confusion on the part of the witness." *Herring*, 207 F.3d at 1030–31 (citing *Camfield Tires, Inc.*, 719 F.2d at 1364–65). In such circumstances, "it would be for the jury to resolve the discrepancy in the deposition testimony and the affidavit." *Id.* at 1031.

*Helm*, 214 F.Supp.2d at 954–55.

Applying these authorities in the present case, the court weighed Gaston's deposition testimony against his summary judgment affidavit to determine whether he attempted to create sham factual issues to avoid summary judgment.

■ Perkins alleges that it terminated Gaston's employment because of his poor performance record and his failure to disclose to Kies, prior to her entering into a snow removal agreement with Stecker Snow Removal, that he himself had entered into a snow removal agreement two months prior with Kevin Sutcliffe. In addition, Perkins alleges that Gaston violated company policy when he entered into the snow removal contract with Sutcliffe because he failed to gain the requisite approval of Regional Manager Chris Bosch. On November 16, 2000, after the first snowfall, both Stecker and Sutcliffe arrived at the Mason City Perkins to remove the snow. Sutcliffe found that Stecker had already removed the snow pursuant to a contract he entered into with Kies. Thus, on November 18, 2000, Perkins terminated Gaston's employment. Thereafter, Sutcliffe sued Perkins and recovered $1,304 for alleged breach of contract. Gaston argues that Perkins did not terminate him on account of his entering into a snow removal agreement for the restaurant's parking lot because "Gaston had authority to enter into a snow removal contract during the time he was General Manager." Pl.'s Br., at 13. However, Perkins does not argue that a general manager of a

restaurant does not have limited authority to arrange for snow removal. Kies Aff., at ¶ 2. Instead, Perkins contends that in the first instance Gaston should have arranged for Bosch to enter into the snow removal contract as regional manager, in accordance with company policy, and Gaston should have been forthcoming with Kies when she confronted him about the contract with Sutcliffe. In Gaston's termination notice Kies stated, "During the process of acquiring snow removal bids and establishing agreements, I consulted you (being the former GM) as to what commitments, if any, had already been established." Def.'s App., at C. In response to Kies's statement, Gaston claims in his affidavit that "If she had ever asked me that, I would have told her. This statement from the termination notice is a lie." Pl.'s Aff., at ¶ 15. Likewise, in his affidavit Gaston stated that "Nobody had ever asked me about whether I had entered into any agreements for purposes of snow removal." Pl.'s Aff., at ¶ 15. In addition, Kies stated in the termination notice that "After assuring me that there were no prior commitments, you then helped me with confirming our current contractor. It was then found that a contract for snow removal was in fact agreed upon and signed by you. When asked about the said [sic] contract, I was lead [sic] to believe

that the contract was not definite [sic] and held no validity." Def.'s App., at C. Gaston responded to the statement in his affidavit with "That statement, other than being grammatically incorrect, is also a patent and blatant misstatement and lie." Pl.'s Aff., at ¶ 16. However, Gaston testified at his deposition when asked whether he recalled any discussions with Kies about the snow removal situation at the Mason City Perkins, "Melissa and I talked about many things when she first came to the store, of course, and I'm sure that that's [snow removal contract] probably one of the things that did come up. We did have a snow removal contract with a gentleman that had been doing it for years. But as I said, we went over many things.... As I said, Melissa and I talked about many things. As far as snow removal, I don't know if [sic] touched on that or not." Pl.'s Dep., at 102 & 103. Again, the court finds that such evidence would not generate a genuine issue of material fact that could overcome Perkins's stated legitimate non-discriminatory reason for terminating Gaston.

In these circumstances, Perkins is entitled to summary judgment on Gaston's disparate treatment claim as a matter of law, because Gaston cannot establish threshold elements of that claim. 3 [6] *See*

6. The court recognizes that "[a]n inference of discrimination may be raised by evidence that a plaintiff was replaced by or treated less favorably than similarly situated employees who are not in the plaintiff's protected class." *Young v. Warner–Jenkinson Co., Inc.,* 152 F.3d 1018, 1022 (8th Cir.1998) (quoting *Price v. S–B Power Tool,* 75 F.3d 362, 365 (8th Cir. 1996)), *cert. denied,* 519 U.S. 910, 117 S.Ct. 274, 136 L.Ed.2d 197 (1996). Even assuming that Gaston could establish a *prima facie* case of reverse sex discrimination, on the record before the court, he has failed to show that Perkins's legitimate, non-discriminatory reason—his poor performance, including poor financial production, human resources issues, and a violation of company policy—for its

adverse employment action against him was pretextual. As the Supreme Court recently explained in *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. at 153, a showing that the employer's proffered reason is not "the real reason" is not enough. Thus, a plaintiff must show, or at least generate a genuine issue of material fact, that the defendants' justification for their conduct is "unworthy of credence." *Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 833–34 (8th Cir.2002) (citing *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097). Again, assuming that Gaston could designate evidence that generates genuine issues of material fact that Perkins's assertions that he was not qualified and in fact "unfit for a management position" are not worthy of be-

FED. R. CIV. P. 56(c) (summary judgment may be granted where the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."); *see also Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law"); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d at 1492 (same). Furthermore, Gaston cannot overcome Perkins's stated legitimate non-discriminatory reason for terminating his employment. Therefore, that portion of Perkins's motion for summary judgment is granted.

### D. Discharge In Violation Of Public Policy Claim

■ Gaston also asserts a state-law claim of wrongful discharge in violation of public policy. Gaston's complaint alleges that he was terminated in retaliation for pursuing his rights under Iowa workers' compensation laws. Iowa courts recognize a cause of action for common-law retaliatory discharge. *See, e.g., Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 686 (Iowa 1990) (recognizing discharge in retaliation for pursuing rights under Iowa workers' compensation laws violates public policy and gives rise to common-law cause of action); *Niblo v. Parr Mfg., Inc.*, 445 N.W.2d 351, 353 (Iowa 1989) (same); *Springer v. Weeks & Leo Co.*, 429 N.W.2d 558, 560–61 (Iowa 1988) (same). Furthermore, this court has articulated the elements of the claim of discharge in violation of public policy under Iowa law in several

recent decisions. *Knutson v. AG Processing, Inc.*, 2002 WL 4222858, at *13 (N.D.Iowa Oct. 29, 2002); *Kallich v. North Iowa Anesthesia Assocs., P.C.*, 179 F.Supp.2d 1043, 1049–51 (N.D.Iowa 2002); *Brown v. Farmland Foods, Inc.*, 178 F.Supp.2d 961, 979–80 (N.D.Iowa 2001); *Kish v. Iowa Cent. Cmty. Coll.*, 142 F.Supp.2d 1084, 1092 n. 3 (N.D.Iowa 2001); *Mercer v. City of Cedar Rapids*, 104 F.Supp.2d 1130, 1173–75 (N.D.Iowa 2000). The elements of the claim include a showing of: "(1) engagement in a protected activity, (2) adverse employment action, and (3) a causal connection between the two." *Teachout v. Forest City Cmty. Sch. Dist.*, 584 N.W.2d 296, 299 (Iowa 1998).

#### 1. Prong one: Protected activity

■ Iowa law recognizes a common-law exception to the general rule of at-will employment when an employee's discharge is in clear violation of a well-established and well-defined public policy. *See, e.g., Fitzgerald*, 613 N.W.2d at 281 (outlining history of at-will employment doctrine and exceptions recognized in Iowa) (citing *French v. Foods, Inc.*, 495 N.W.2d 768, 769–71 (Iowa 1993)) (employee handbook may create unilateral contract); *Springer*, 429 N.W.2d at 560 (narrow public policy exception adopted); *Abrisz v. Pulley Freight Lines, Inc.*, 270 N.W.2d 454, 455 (Iowa 1978) (first recognizing the possibility of public policy exception). In this case, it is undisputed that Gaston made a claim for workers' compensation benefits in connection with his alleged work-related injury, which is protected activity under *Springer* and its progeny. *See Springer*,

---

lief, it is the second requirement under *Reeves* to avoid summary judgment that is fatal to Gaston's disparate treatment claim. Def.'s Br., at 12; *see* FED. R. CIV. P. 56(e) (the non-movant's burden is to designate "specific facts showing that there is a genuine issue for trial"). Gaston has designated no evidence

that suggests that *his gender* was the "real reason" for the disparity in light of the evidence of Perkins's proffered legitimate reason. *Reeves*, 530 U.S. at 153, 120 S.Ct. 2097; *Smith*, 302 F.3d at 835. Gaston's evidence on this issue is comprised entirely of conjecture and surmise.

429 N.W.2d at 560; *Smith v. Smithway Motor Xpress, Inc.,* 464 N.W.2d 682, 686 (Iowa 1990); *Niblo v. Parr Mfg., Inc.,* 445 N.W.2d 351, 353 (Iowa 1989). Thus, there is no dispute as to the existence of the first element of Gaston's discharge in violation of public policy claim.

### 2. Prong two: Adverse employment action

The next element of Gaston's *prima facie* case of retaliatory discharge is also undisputed: that his employment with Perkins was terminated. However, a plaintiff who alleges retaliatory discharge in violation of public policy must not only have engaged in protected conduct and have been terminated; his discharge must be causally connected to his participation in a protected activity. *E.g., Fitzgerald,* 613 N.W.2d at 289. The crux of the factual issue in this case is whether Gaston has generated a genuine issue of material fact with respect to the third prong of his *prima facie* case of wrongful discharge. Accordingly, the court will turn its attention to this last element.

### 3. Prong three: Causal connection

As stated, the final element of a *prima facie* case of wrongful discharge in violation of public policy is a showing that the protected conduct, here, Gaston's filing of a workers' compensation claim, caused Perkins to terminate his employment. *See id.* "The protected conduct must be the determinative factor in the decision to terminate the employee." *Id.* (citing *Teachout,* 584 N.W.2d at 300–01). "A factor is determinative if it is the reason that 'tips the scales decisively one way or the other,' even if it is not the predominant reason behind the employer's decision." *Teachout,* 584 N.W.2d at 302 (quoting *Smith v. Smithway Motor Xpress Inc.,* 464 N.W.2d at 686); *see also Sanford v. Meadow Gold Dairies, Inc.,* 534 N.W.2d 410, 412 (Iowa 1995) ("An essential element of the claim is a showing concerning the employer's specific motivation in firing; it must appear that the discharge was prompted by the filing of the workers' compensation claim."). While the causation standard is high, it generally "presents a question of fact. Thus, if there is a dispute over the conduct or the reasonable inferences to be drawn from the conduct, the jury must resolve the dispute." *Fitzgerald,* 613 N.W.2d at 289 (citing 2 HENRY H. PERRIT, JR., EMPLOYEE DISMISSAL LAW AND PRACTICE § 7.21, at 54 (4th ed.1998)). Further, in ruling on a motion for summary judgment, the court's role is not to determine whether the plaintiff will prevail at trial; the court merely must ascertain whether the plaintiff has generated genuine issues of material fact. *Cf. Quick,* 90 F.3d at 1376–77; *Johnson,* 906 F.2d at 1237.

Gaston, of course, argues there are genuine issues of material fact concerning whether Perkins's decision to terminate him was because he filed for and received workers' compensation benefits. Gaston argues that Kies's reaction to Gaston's work-related injury supplies the requisite causal link between Gaston's filing for workers' compensation benefits and his subsequent discharge, not to mention that he was discharged approximately three and a half weeks after he returned to work with his arm in a sling. In addition, Gaston alleges that he suffered hostile treatment both at the time of his injury and when he returned to work and filed for workers' compensation benefits. Perkins argues that Gaston's purported evidence of retaliation is insufficient because Gaston admits that neither Kies nor Bosch ever did or said anything that led him to believe that the real reason for his termination was not the stated reason in the termination notice. According to Perkins, none of Kies's alleged actions on the day of Gaston's injury yield an inference of intent to retaliate against Gaston for filing a

workers' compensation claim thereafter. Perkins also contends that the temporal connection between Gaston's work-related injury and his termination is insufficient to generate a fact issue on the causation element of his *prima facie* case. Furthermore, Perkins claims that Gaston's real argument is with regard to the snowplow contract incident, which the plaintiff offers as proof of pretext and therefore, does not come into play unless the plaintiff establishes a genuine issue of material fact regarding the causation element of his *prima facie* case.

The court first must consider the impact of the apparent disparity between Gaston's explanations in his affidavit regarding his workers' compensation claim and his explanations given at his deposition at an earlier date. *See Barnes,* 238 F.Supp.2d at 1093–95 (quoting *Helm Financial Corp.,* 214 F.Supp.2d at 954).

Gaston testified in his deposition that when he injured himself at work, he telephoned Kies to tell her that he was injured and needed her to take him to the hospital. According to Gaston, Kies did not arrive at the store for nearly two hours, and when she did, Kies asked Gaston to finish counting inventory before he went to the hospital "despite the fact that I was in obvious and intense pain." Pl.'s Aff., at ¶ 11. Gaston asserts that the proper protocol is for the injured employee to report the injury to the general manager whose responsibility it is to report the injury up the chain of command and seek immediate medical treatment for the injured employee. Gaston claims that after he finished the inventory he again asked Kies to take him to the hospital. Kies replied that he should

call his wife for a ride, and handed him twenty dollars with instructions to stop at the store on his way back from the hospital and purchase some supplies for the restaurant.

In the weeks after he injured himself, Gaston claims that Kies was hostile toward him and acted as though he "was in the way and was a hassle." Pl.'s Aff., at ¶ 18. In response to defendant Perkins's statement of material fact alleging that Kies accommodated Gaston's temporary condition by changing his duties, and taking over some of Gaston's kitchen duties to avoid use of his right arm, Gaston states "there were times Kies told Gaston to work in the kitchen forcing him to do the dishes with one arm." Pl.'s Response to Def.'s Stmt. of Undisputed Material Facts, at ¶¶ 98–99.3 [7] In contrast, when questioned at his deposition whether he was asked to do any work that was beyond his restrictions, Gaston replied, "Not to the best of my recollection." Pl.'s Dep., at 122. Furthermore, Gaston testified that Kies was able to accommodate his restrictions, even stating that "She [Kies] took over some [*sic*] the kitchen duties, and I took over some of the front house duties." Pl.'s Dep., at 121–22. These statements are not directly contradictory given Gaston's uncertainty at times as evidenced by his deposition testimony.

Gaston also explained in his affidavit that "each individual store is charged for workers who are injured and on workers' compensation," although Gaston admits to not recalling the charge structure. Pl.'s Aff., at ¶ 18. Gaston asserted in his affidavit that Kies "was angry for my injury at

---

**7.** Plaintiff Gaston cites his affidavit for the fact that Kies forced him to wash dishes with one arm. However, the court finds Gaston's affidavit, along with the remainder of the record, devoid of any such evidence and therefore, the allegation has no real basis in the record. *See Hartnagel v. Norman,* 953

F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (explaining that an issue of material fact is genuine if it has a real basis in the record)).

work and how it was affecting the bottom line for Perkins," because "Workers' compensation claims have a negative impact on each store's bottom line." Pl.'s Aff., at ¶¶ 17 & 18. However, Gaston testified at his deposition that a manager of a restaurant did not have any financial incentive to try to get rid of employees who filed workers' compensation claims. Pl.'s Dep., at 119. Gaston admitted at his deposition that he thought but could not recall whether the cost of workers' compensation benefits were a part of the restaurant's bottom line. Pl.'s Dep., at 119. Likewise, Gaston testified at his deposition that he did not know whether or not his specific insurance experience or his rating or the cost of his individual workers' compensation experience was factored into the Mason City Perkins's bottom line. Pl.'s Dep., at 119. Again, these statements are not directly contradictory. It seems likely that Gaston was able to recall after his deposition, with a greater degree of certainty, the answers to some of opposing counsel's questions regarding the impact of workers' compensation claims to individual restaurants, specifically the Mason City Perkins. Although these differences between his deposition testimony and his summary judgment affidavit may impact his credibility, the court does not find Gaston is attempting to raise sham issues for purposes of avoiding summary judgment.

Furthermore, Gaston relies on the fact that he was allegedly discharged approximately three and a half weeks after he returned to work with his work-related injury. In various contexts, the Eighth Circuit Court of Appeals has held that the causal connection between allegedly retaliatory action by the employer and protected activity by the employee can be established by proof that the discharge followed the protected activity so closely in time as to justify an inference of retaliatory motive. *See Hansen v. Sioux By–Products*, 988 F.Supp. 1255, 1268–69 (N.D.Iowa 1997)

(citations omitted). As this court explained in *Hansen:*

> Although the Iowa Supreme Court has stated that "[t]he mere fact that an adverse employment decision occurs after [protected activity] is not, standing alone, sufficient to support a finding that the adverse employment decision was in retaliation to the discrimination claim," *Hulme II*, 480 N.W.2d at 43, the inference arising from such temporal proximity may be sufficient to preclude summary judgment, however hotly the issue may be contested at trial, particularly where temporal proximity is coupled with other evidence giving rise to an inference of illegal motive. *See Walters v. U.S. Gypsum Co.*, 537 N.W.2d 708, 712 (Iowa 1995).

*Id.* In *Hansen,* the court found that Hansen's termination the same day as he reported a work-related injury and sought medical treatment under his employer's workers' compensation coverage "raises inferences that may be sufficient to defeat a summary judgment motion by the employer." *Id.* at 1268–69; *see, e.g., Webner,* 101 F.Supp.2d at 1230 (five days between protected activity and adverse action was sufficient to establish a causal connection for purposes of a prima facie case of wrongful discharge).

The circumstances surrounding Gaston's termination do not lend themselves to an inference of retaliatory motive, which is the "something more" than temporal proximity that Gaston has to offer to generate a genuine issue of material fact on the causal element of his claim of retaliatory discharge. *Cf. Clarey v. K–Products, Inc.*, 514 N.W.2d 900, 903 (Iowa 1994) (evidence of employer's harassment of other employees who filed workers' compensation claims admissible to show motive); *see Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198, 203 (Iowa 1997) (citing *Hulme*

*v. Barrett,* 480 N.W.2d 40, 43 (Iowa 1992) (Hulme II)). The vast majority of Gaston's evidence of causation is based upon Kies's reaction the day of Gaston's injury. Pl.'s Br., at 11. At this point in time, neither Kies nor Gaston knew the severity of the injury, whether it would be permanently or temporarily limiting, if at all, Gaston had not yet filed a workers' compensation claim, and there is no evidence of any discussion, let alone between Gaston and Kies, regarding workers' compensation. Thus, the court reasons that Gaston's evidence of Kies's treatment of him on the day of his injury is insufficient to allow a trier of fact to infer a causal link between Gaston's claim for workers' compensation benefits and his termination. If anything, the court believes that such evidence merely reveals Kies's inability to determine the severity of Gaston's injury. With concern for the remainder of Gaston's evidence of causation, it appears that Gaston believed that Perkins accommodated his work restrictions and treated him fairly up until the time of his termination. Gaston testified at his deposition that when Kies provided him with his termination notice, "It was quite a surprise to me." Pl.'s Dep., at 108. According to Gaston, he thought that Kies had treated him fairly leading up to his termination and believed that he and Kies worked well together. Pl.'s Dep., at 108. Again, the court determines that Gaston's evidence of causation is insufficient to allow a reasonable jury to infer a causal link between Gaston's claim for workers' compensation benefits and his termination.

Gaston's final argument centers on whether he has cast doubt on Perkins's stated legitimate non-discriminatory reason for dismissing him. *See supra* Part II.C., at 23–26. However, without a showing of causation, which is an element of Gaston's *prima facie* case, the "pretext" phase of the burden-shifting analysis is not implicated. On the present record, there-fore, the court concludes that Gaston has failed to generate a genuine issue of material fact on whether his workers' compensation claim was the determinative factor in Perkins's decision to terminate him, in violation of Iowa public policy. Furthermore, even if Gaston had generated a genuine issue of material fact on his retaliatory discharge claim, the court finds after weighing Gaston's explanations in his affidavit regarding the real reason he alleged he was terminated and his explanations given at his deposition at an earlier date that he attempted to create a sham factual issue to avoid summary judgment. *Helm,* 214 F.Supp.2d at 954–55.

Therefore, because Gaston has failed to generate a genuine issue of material fact on his *prima facie* case of retaliatory discharge, the court grants that portion of Perkins's motion for summary judgment.

### III. CONCLUSION

Gaston concedes that there are no genuine issues of material fact with regard to his disability discrimination claim under the ADA. The court concludes that Gaston has failed to generate a genuine issue of material fact on his disparate treatment sex discrimination claim as a matter of law, because Gaston cannot establish threshold elements of that claim. Finally, the court finds that Gaston has not presented evidence tending to prove his filing of workers' compensation claims was a determining factor in Perkins's decision to terminate him. For these reasons, the court **grants defendant's Motion for Summary Judgment on all counts.** This case is dismissed in its entirety.

**IT IS SO ORDERED.**